

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:10mj 323 |
| | ) | |
| CALVIN EDWARD DOVE, JR., | ) | |
| aka "Butch," | ) | |
| LINDA ANN DOVE, | ) | |
| VALORIE L. EVANS, | ) | |
| KIMBERLY L. JOHNSON, | ) | |
| LOUIS J. MARTELLI, | ) | |
| JAMES L. MARTELLI, | ) | |
| JUANITA K. MYERS, and | ) | |
| BRETT P. REEL, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT IN SUPPORT OF
## CRIMINAL COMPLAINT AND ARREST WARRANTS

I, Aaron K. Weeter, being duly sworn, depose and state as follows:

1.  I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and have served as a Special Agent of the FBI for approximately twelve years. Accordingly, I am empowered by law to conduct investigations, make arrests, and execute and serve search and arrest warrants for offenses enumerated in Titles 18 and 21 of the United States Code, including offenses involving the illegal distribution of oxycodone, hydromorphone, and other prescription narcotics referred to in Title 21, United States Code, Sections 841(a)(1) and 846. Since 1998, I have been assigned to a white collar crime squad in the Criminal Division of the Washington Field Office specializing in the investigation of health care crimes including pharmaceutical drug diversion and distribution. During this period, I have conducted many prescription drug

distribution investigations to include the execution of dozens of controlled purchases of prescription narcotics and search and arrest warrants in furtherance of these investigations.

2.      As a Special Agent with the FBI, I have interviewed countless individuals involved in narcotics trafficking and have obtained information from them regarding the means and methods of acquisition, sale, and distribution of controlled substances, including prescription narcotics. Through my training and experience, I am also familiar with the techniques and methods by which drug traffickers distribute controlled substances. In addition, I am familiar with the use, effects, appearance, and methods of packaging controlled substances for sale.

3.      Title 21, United States Code, Section 841(a)(1) prohibits any person from knowingly or intentionally manufacturing, distributing, or dispensing, or possessing with intent to manufacture, distribute, or dispense, a controlled substance. Title 21, United States Code, Section 846, prohibits any person from attempting or conspiring to commit any offense in the same subchapter, including Section 841(a)(1).

4.      Based on my training and experience, I am aware that oxycodone and hydromorphone are Schedule II controlled substances. Schedule II controlled substances, according to the Drug Enforcement Administration's scheduling parameters, are substances which have a high potential for abuse. Schedule II controlled substances also have a currently accepted medical use in treatment in the United States, generally subject to comprehensive restrictions and regulations. Abuse of Schedule II controlled substances may lead to severe psychological or physical dependence.

5.      I am familiar with oxycodone, the active ingredient in OxyContin™, Roxicodone™, Percocet™ and various generic oxycodone medications. Oxycodone is very

popular among abusers of pharmaceutical drugs. I am aware that addicts abuse OxyContin by various means to include swallowing the tablets whole; chewing and then swallowing them; smoking them through a tube; crushing them and then snorting the powder; or crushing them and then dissolving them in water and injecting the resulting liquid into their bloodstream.

6.    OxyContin is described in the Physician's Desk Reference Manual 2008 Edition as follows:

OxyContin (Oxycodone HCl Controlled Release) Tablets

WARNING:

OxyContin is an opioid agonist and a Schedule II controlled substance with an abuse liability similar to morphine.

Oxycodone can be abused in a manner similar to other opioid agonists, legal or illicit. This should be considered when prescribing or dispensing OxyContin in situations where the physician or pharmacist is concerned about an increased risk of misuse, abuse, or diversion.

OxyContin tablets are to be swallowed whole and are not to be broken, chewed, dissolved or crushed. Taking broken, chewed, dissolved, or crushed OxyContin tablets leads to rapid release and absorption of a potentially fatal dose of oxycodone.

7.    I am also familiar with hydromorphone, the active ingredient in Dilaudid™ and various generic hydromorphone medications. Hydromorphone is also very popular among abusers of pharmaceutical drugs. I am aware that addicts abuse Dilaudid by swallowing the tablets whole; chewing and then swallowing them; and by crushing them and then dissolving them in water and injecting the resulting liquid into their bloodstream.

8.    Dilaudid is described in the Physician's Desk Reference Manual 2008 Edition as follows:

-3-

DILAUDID tablets (hydromorphone hydrochloride)

WARNING:

Dilaudid (Sterile solution for parenteral administration, 2 and 4 mg tablets, rectal suppositories, and non-sterile powder) contains hydromorphone, which is a potent Schedule II controlled opioid agonist. Schedule II opioid agonists, including morphine, oxymorphone, oxycodone, fentanyl, and methadone, have the highest potential for abuse and risk of producing respiratory depression. Alcohol, other opioids and central nervous system depressants (sedative-hypnotics) potentiate the respiratory depressant effects of hydromorphone, increasing the risk of respiratory depression that might result in death.

9.      In addition, I am aware that drug addicts frequently exchange prescription narcotics for other illicit narcotics such as cocaine or cocaine base. OxyContin tablets typically sell on the street at a price between $.50 to $1.00 per milligram (mg) of oxycodone. As a result, the typical price for a 40 mg OxyContin tablet is between $20 and $40. Similarly, the typical price for an 80 mg OxyContin tablet is between $40 and $80. Roxicodone, another form of oxycodone tablet, is also abused, but typically sells on the street for somewhat less per milligram than OxyContin. Dilaudid tablets typically sell for between $10 and $20 per tablet on the street depending upon the dosage strength.

10.      This affidavit is submitted in support of a criminal complaint and arrest warrant for Calvin Edward Dove, Jr., aka "Butch," Linda Ann Dove, Valorie L. Evans, Kimberly L. Johnson, Louis J. Martelli, James L. Martelli, Juanita K. Myers, and Brett P. Reel, who, from in or about 2009 through the present within the Eastern District of Virginia, knowingly and intentionally conspired to distribute, dispense, or possess with intent to distribute or dispense (1) oxycodone, commonly known by the brand names OxyContin, Roxicodone and Percocet and (2)

hydromorphone, commonly known by the brand name Dilaudid, both Schedule II controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

11.     The facts and information contained in this affidavit are based upon my personal knowledge of this investigation, as well as the observations of other law enforcement officers involved in this investigation. All observations not personally made by me were related to me by the person(s) who made such observations. This affidavit contains information necessary to support probable cause for this search warrant. The affidavit is not intended to include each and every fact and matter observed by me or known to the government.

### Information About Five Controlled Purchases of Narcotics from Calvin Edward Dove, Jr.

12.     On February 16, 2010, Confidential Informant 1 (hereafter referred to as CI-1), while under physical and electronic surveillance by law enforcement officers of the Prince William County Narcotics Task Force, engaged in a controlled narcotics purchase from Calvin Dove in Woodbridge, Virginia. During this controlled narcotics purchase, CI-1 purchased 20 tablets from Calvin Dove for $800.00. Calvin Dove provided these tablets to CI-1 from a prescription bottle bearing the name "Brett Reel." After departing the company of Calvin Dove, CI-1 provided these tablets to the Prince William County Narcotics detective handling this operation. The detective examined the size, coloration, and markings of these tablets and thereafter confirmed with Poison Control that they were consistent with the tablets being OxyContin tablets.

13.     On April 6, 2010, CI-1, while under physical and electronic surveillance by law enforcement officers of the Prince William County Narcotics Task Force, engaged in a second

controlled narcotics purchase from Calvin Dove inside his vehicle while it was parked in Woodbridge, Virginia. This vehicle was observed by law enforcement to be a blue Lincoln sedan bearing Virginia license plate xxx 7805. During this controlled narcotics purchase, CI-1 purchased 10 tablets from Calvin Dove for $650.00. During this transaction, Calvin Dove told CI-1 that he could sell CI-1 larger quantities of OxyContin if CI-1 wanted to purchase them at a later time. After departing the company of Calvin Dove, CI-1 provided the tablets CI-1 had purchased from Calvin Dove to the Prince William County Narcotics detective handling this operation. The detective examined the size, coloration and markings of these tablets confirming that they were consistent with OxyContin tablets.

14.     On April 19, 2010, CI-1, while under physical and electronic surveillance by law enforcement officers of the Prince William County Narcotics Task Force, engaged in a third controlled narcotics purchase from Calvin Dove in Woodbridge, Virginia. During this transaction, law enforcement observed CI-1 talking with Calvin Dove while they were seated inside a gray Honda with Virginia license plate xxx 7187. During the third controlled narcotics purchase, CI-1 purchased 10 tablets from Calvin Dove for $750.00. After departing the company of Calvin Dove, CI-1 provided these tablets to the Prince William County Narcotics detective handling this operation. The detective examined the size, coloration and markings of these tablets confirming that they were consistent with OxyContin tablets.

15.     On April 29, 2010, CI-1, while under physical and electronic surveillance by law enforcement officers of the Prince William County Narcotics Task Force, engaged in a fourth controlled narcotics purchase from Calvin Dove inside a vehicle while it was parked in Woodbridge, Virginia. This vehicle was observed by law enforcement to be a gray Ford pickup

truck bearing Virginia license plate xxx 1038. Seated in the truck at the time of the fourth controlled purchase were the CI, Calvin Dove, and Linda Dove. During the fourth controlled narcotics purchase, CI-1 purchased 40 tablets from Calvin Dove for $840.00. After departing the company of Calvin Dove, CI-1 provided these tablets to the Prince William County Narcotics detective handling this operation. The detective examined the size, coloration and markings of these tablets confirming that they were consistent with oxycodone tablets.

16.     On May 10, 2010, CI-1, while under physical and electronic surveillance by law enforcement officers of the Prince William County Narcotics Task Force and by your affiant, engaged in a fifth controlled narcotics purchase from Calvin Dove inside his vehicle while it was parked in Woodbridge, Virginia. This vehicle was observed by law enforcement to be a blue Lincoln sedan bearing Virginia license plate xxx 7805. During the fifth controlled narcotics purchase, CI-1 purchased 20 tablets from Calvin Dove for $435.00. After departing the company of Calvin Dove, CI-1 provided these tablets to the Prince William County Narcotics detective handling this operation. The detective examined the size, coloration and markings of these tablets confirming that they were consistent with Dilaudid tablets.

### Information About Two Controlled Purchases of Narcotics
### from Linda Ann Dove

17.     On February 23, 2010, CI-1, while under physical surveillance by law enforcement officers of the Fairfax County Narcotics Task Force, engaged in a controlled purchase of narcotics from Linda Dove in Lorton, Virginia. During the controlled narcotics purchase, CI-1 purchased 20 tablets from Linda Dove for $400.00. The Fairfax County Narcotics detective handling this operation was in a position to see CI-1 meeting with Linda Dove and

-7-

observed the narcotics transaction between CI-1 and Linda Dove. After departing the company

of Linda Dove, CI-1 provided these tablets to the Fairfax County Narcotics detective handling

this operation. The detective examined the size, coloration and markings of these tablets

confirming that they were consistent with Dilaudid tablets.

18.     On March 11, 2010, CI-1, while under physical surveillance by law enforcement

officers of the Fairfax County Narcotics Task Force, engaged in a second controlled purchase of

narcotics from Linda Dove at her and Calvin Dove's joint residence, located at xxxxx xxx

xxxxxxxxxx xxxx, Lorton, VA 22079, hereinafter referred to as "the Residence." During this

controlled narcotics purchase, CI-1 purchased 20 tablets from Linda Dove for $400.00. After

departing "the Residence," CI-1 provided these tablets to the Fairfax County Narcotics detective

handling this operation. The detective examined the size, coloration and markings of these

tablets confirming that they were consistent with Dilaudid tablets.

### Interviews of CI-1

19.     On May 4, 2010, your affiant interviewed CI-1. CI-1 provided the following

information: Calvin Dove has been selling prescription drugs for about a year with the volume

of his pill distribution increasing significantly in the past six months. Calvin Dove is currently

operating a pill distribution scheme involving a group of as many as 15 to 20 "patients" who

obtain prescriptions from at least two doctors in Northern Virginia. Calvin Dove drives these

"patients" to the doctors' offices for their appointments and thereafter drives them to pharmacies

to fill their prescriptions. Calvin Dove pays for the cost of the "patients'" doctors appointments

and for the cost to fill their prescriptions at the pharmacies. In exchange, the "patients" receive a

few of the pills for their efforts and Calvin Dove retains the majority of the pills. Calvin Dove

-8-

then sells these pills at a significant profit, as much as $4,000 per set of "patient" prescriptions, to a network of customers, many of whom come to buy the pills at "the Residence." Customers of Calvin Dove pay him up to $80 per pill. In addition to cash, Calvin Dove barters the pills for various merchandise, such as tools and vehicles. Calvin Dove usually carries at least $3,000 in cash on his person. The physicians being utilized in this scheme include "Dr. Victor," an Asian male physician who practices at a clinic on xxxxxx xxxx in Manassas, Virginia, and another physician located in Arlington or Alexandria, Virginia. Calvin Dove's "patients" typically obtain prescriptions for OxyContin 40 mg tablets, oxycodone 30 mg tablets and Percocet tablets. Calvin Dove obtains prescriptions in his own name for Dilaudid and Percocet tablets. Calvin's wife, Linda Dove, sells some of the Dilaudid and Percocet that Calvin Dove is prescribed, but also sells oxycodone and OxyContin. Linda Dove sells pills at the residence she shares with Calvin. Linda Dove also obtains prescriptions in her own name for Percocet tablets. Two of the pharmacies that Calvin Dove has utilized to fill prescriptions are "Pharmacy I" in Lorton, Virginia, near his house, and "Pharmacy II" in Woodbridge, Virginia. Calvin Dove's "patients" are both male and female and include, but are not limited to, the following persons: Juanita Myers, Brett Reel, Kim (last name unknown to CI-1 ("LNU")), Val LNU and Louis LNU. Calvin Dove primarily utilizes his cellular telephone, number (xxx) xxx-1833, to coordinate his drug trafficking activities.

20.　　On May 10, 2010, your affiant met with CI-1 and showed CI-1 a number of unlabeled, color photographs. From these photographs, CI-1 identified a photograph of Louis Martelli, DOB xx/xx/1970 as the person CI-1 knew as "patient" Louis LNU. CI-1 also identified a photograph of James Martelli, DOB xx/xx/1955 as the person CI-1 knew as "patient" Jimmy

LNU, the brother of "patient" Louis LNU. CI-1 also identified a photograph of Brett Reel, DOB xx/xx/1974 as the person CI-1 knew as "patient" Brett Reel. CI-1 also identified a photograph of Kimberly Johnson, DOB xx/xx/1978 as the person CI-1 knew as "patient" Kim LNU.

21.    On May 27, 2010, your affiant met again with CI-1 and showed CI-1 a number of unlabeled, color photographs. From these photographs, CI-1 identified a photograph of Valorie Evans, DOB xx/xx/1957 as the person CI-1 knew as "patient" Val LNU. Val LNU often serves as a "driver" for Calvin Dove. CI-1 also identified a photograph of Juanita Myers, DOB xx/xx/1964 as the person CI-1 knew as "patient" Juanita Myers.

22.    On June 1 and 2, 2010, your affiant interviewed CI-1. CI-1 provided the following information: Calvin Dove has bragged to CI-1 about how many pills he has sold and how much money he has made selling them. Calvin Dove has told CI-1 that he keeps the pills he obtains from his "patients" in pill bottles labeled with his own name, Calvin Dove. Calvin Dove has told CI-1 that if the police find the pills on him, they won't be able to do anything with them because the bottles have his name, and not a "patient's," on them. CI-1 related the following information specific to the named defendants:

- **Louis Martelli** - Calvin Dove told CI-1 that he has provided money to Louis Martelli so that Martelli can fill his prescriptions and that in exchange, Calvin Dove gets to keep a portion of Martelli's pills. Calvin Dove told CI-1 that Louis Martelli has several identification cards in different names and that he uses these identities to get more pills from different doctors.

- **James Martelli & Louis Martelli** - CI-1 has witnessed and overheard a conversation between Calvin Dove, Louis Martelli, James Martelli, and another

-10-

man while they were all in the driveway outside of Calvin Dove's house. During this conversation, Calvin Dove was bargaining with these men about how many pills he would get from the prescriptions of James Martelli and the other man in exchange for his money.

- **Juanita Myers** - Myers told CI-1 that Calvin Dove had taken her to his doctor, had paid for her appointment fee and for the cost to fill her prescriptions. In exchange, Dove kept most of Myers' pills leaving her with only 30 or 40 tablets from the total of 360 OxyContin 40 mg and oxycodone 30 mg tablets she had been prescribed. Myers felt that Dove had "ripped her off" with this transaction and asked CI-1 if CI-1 he was interested in paying the cost to fill her next prescription.

- **Brett Reel** - Reel told CI-1 that Calvin Dove takes him to the doctor to get pills, but that he keeps too many of the pills. Reel told CI-1 that Calvin Dove keeps the pills in exchange for the money Reel owes him for bailing him out of jail, for the money Reel owes him for living at his house, and to cover the cost to him of filling the prescriptions at the pharmacy. Calvin Dove has also told CI-1 that he has taken Reel to the doctor to get pills.

- **Kim Johnson** - Johnson told CI-1 that she goes to the doctor with Calvin Dove to pay him back for allowing her to live at his house. Johnson has told CI-1 that in exchange for her going to the doctor and getting the prescriptions for the pills, Calvin Dove doesn't charge her for rent, allows her to keep some of the pills, and also gives her some cash.

-11-

- **Valorie L. Evans** - CI-1 has seen Evans split up pills with Calvin Dove at Dove's residence after they've returned from obtaining prescriptions for Evans. On the morning of June 2, 2010, CI-1 witnessed Evans leave Dove's residence with Dove and two other persons on their way to the physician's office to obtain prescriptions for the two other persons. Dove later called CI-1 and informed CI-1 that he was still waiting at the doctor's office for the prescriptions because the line of patients was long.

23.     In my training and experience, I have found that information provided by confidential informants is often significant in investigating criminal conspiracies. In this case, CI-1 has been convicted of several felonies and misdemeanors, as well as having been charged with several other offenses for which he was not convicted. CI-1 assisted law enforcement in two separate jurisdictions, in one for financial benefit and in the other because he was facing an alcohol-related driving offense. Therefore, it was important to be able to independently verify the information provided by CI-1. I believe that the information provided by CI-1 and outlined in the preceding paragraphs is reliable because, in addition to the physical and electronic surveillance that captured his controlled purchases of narcotics from Calvin and Linda Dove, I have been able to independently corroborate his account through the use of the investigative techniques outlined below, which include surveillance and reviewing the Virginia Prescription Monitoring Program Data, cell phone records, and Virginia Department of Motor Vehicles registration records.

### Recording of Meeting Between CI-1 and Calvin Dove on May 13, 2010

24.     On May 13, 2010, at the direction of law enforcement, CI-1 made a consensually

monitored recording of a discussion CI-1 had with Calvin Dove at "the Residence." During

portions of this conversation, "patients" Val LNU and Kim LNU were present at "the

Residence." During this recorded conversation, Calvin Dove stated that he had a number of

OxyContin tablets to sell to CI-1 on that date. Calvin Dove acknowledged that he previously

sold large quantities of pills on a daily basis. Calvin Dove acknowledged very recently taking a

man named "Ricky" to the doctor, but stated that he was going to "quit dealing for a while"

because there was "too much heat around." Calvin Dove stated that it cost $1,400 to fill a

"patient's" prescriptions. During a discussion with CI-1 about the type, quantity and cost of pills,

Calvin Dove acknowledged taking "Juanita" to the doctor "because she was sick and she had

medical records." Dove stated that he was not going to sell any pills to a person with the initials

SC because SC's wife "put the word out" that if "she finds out anyone is selling him pills she's

calling the police."

### Review of Manassas City Police Department Report Dated December 29, 2009

25.     In May 2010, your affiant reviewed a Manassas City Police Department arrest

report dated December 29, 2009. This report detailed the December 29, 2009 arrest of Louis

Martelli, DOB: xx/xx/1970. In summary, the report stated the following: The police were

contacted on December 29, 2009 by "Dr. Victor" who practices as part of a medical clinic located

on xxxxxx xxxx in Manassas, Virginia. "Dr. Victor" informed the police that he suspected that

his patient Louis Martelli, in the office at that time, was utilizing two different dates of birth to

obtain prescriptions for controlled medications. Thereafter, the police arrested Martelli based

upon the existence of an outstanding warrant. At the time he was arrested, Martelli was found to

possess a hypodermic needle which he told the police was for "shooting up." Martelli denied

having any weapons on his person, but was found to have a fixed blade knife in a sheath on his belt which had been concealed under his sweatshirt. During a subsequent interview, Martelli told the police that he used heroin and controlled medications. Martelli further told them that he purchased controlled medications from a man named "Edmond" who lived in a house on Gunston Road in Lorton, Virginia. Martelli described "Edmond" as a white male, 6'2", 300 pounds with short grayish, blonde hair and a short beard. Martelli described "Edmond's" house as a white, one-story rambler with black shutters, a dirt driveway and a large, unfenced yard. Martelli told the police that "Edmond's" driveway usually had a lot of vehicles parked in it. Martelli further told the police that "Edmond" usually sold oxycodone or hydromorphone (Dilaudid) and that he would purchase the pills from "Edmond" in "Edmond's" kitchen inside his house. The telephone number listed for Martelli in this police report was (xxx) xxx-0814.

### Description of Calvin Dove and his Residence as Observed by Your Affiant

26.     Your affiant has reviewed the Virginia Department of Motor Vehicles Driver's License photograph and descriptive data related to Calvin Dove, DOB xx/xx/1954. The descriptive data lists Calvin Dove as having the middle name Edward, being 6'1"tall, weighing 305 pounds and having an address of "the Residence." The photograph, listed as taken on 04/24/2008, depicts Calvin Dove as having a short length, grayish beard with blondish hair on his head.

27.     On numerous occasions in April and May 2010, your affiant has observed Calvin Dove's property and residence located at "the Residence." Your affiant has observed the residence to be a one-story rambler with white siding and black shutters. Your affiant has observed the driveway to the residence to be dirt and gravel. Your affiant has observed the

-14-

property to be unfenced and directly adjacent to Gunston Road very close to its intersection with Old Colchester Road. On most occasions when your affiant has had the opportunity to view the driveway at this residence, your affiant has noted it to be filled with a variety of cars, vans and pickup trucks.

## Review of Virginia Prescription Monitoring Program Data

28. Your affiant is aware that the Commonwealth of Virginia instituted a statewide, prescription monitoring program in 2006 that records the filling of controlled substance prescriptions at pharmacies in Virginia. This program is commonly referred to as the Prescription Monitoring Program or "PMP."

29. As part of this investigation, your affiant obtained and reviewed the PMP records for Calvin Dove DOB xx/xx/1954 and Linda Dove DOB xx/xx/1960, as well as the following individuals listed in paragraphs 19, 20, 21, and 22: Brett Reel, DOB xx/xx/1974; Kimberly Johnson, DOB xx/xx/1978; Louis Martelli, DOB xx/xx/1970; James Martelli, DOB xx/xx/1955; Juanita Myers, DOB xx/xx/1964; and Valorie Evans, DOB xx/xx/1957. Your affiant's review of the PMP for these persons yielded the following information:

- Calvin Dove utilized the address of "the Residence," among others, to fill his prescriptions. Calvin Dove filled 35 controlled substance prescriptions at pharmacies in Virginia from July 2009 through April 2010. Included in these were prescriptions for OxyContin 40 mg tablets, oxycodone 30 mg tablets, Dilaudid tablets, and oxycodone 5 mg tablets (*i.e.* Percocet tablets). Dove utilized "Pharmacy I" in Lorton, Virginia to fill some of these prescriptions. Dove obtained some of his prescriptions from physician xxxxx xxxx, referred to herein as "Physician II," whose practice address is in Alexandria, Virginia.

- Linda Dove utilized the address of "the Residence," among others, to fill her prescriptions. Dove filled 66 controlled substance prescriptions at pharmacies in Virginia from May 2009 through April 2010. Included in these were prescriptions for oxycodone 5 mg tablets (*i.e.* Percocet tablets) and Dilaudid tablets.

-15-

- Brett Reel filled 10 controlled substance prescriptions at pharmacies in Virginia from September 2009 through May 2010. Included in these were prescriptions for oxycodone 30 mg tablets and for OxyContin tablets. Reel utilized "Pharmacy I" in Lorton ,Virginia to fill some of these prescriptions. Reel obtained some of these prescriptions from "Physician II" whose practice address is in Alexandria, Virginia, and other prescriptions from physician with the first name Victor, along with his associates, in Manassas, Virginia.

- Kimberly Johnson filled 8 controlled substance prescriptions at pharmacies in Virginia from October 2009 through April 2010. Included in these were prescriptions for OxyContin 40 mg tablets and oxycodone 5 mg tablets (*i.e.* Percocet tablets). Johnson utilized "Pharmacy I" in Lorton, Virginia and the "Pharmacy II" in Woodbridge, Virginia to fill some of these prescriptions. Johnson obtained some of these prescriptions from a physician with the first name Victor, along with his associates, in Manassas, Virginia.

- Valorie Evans filled 16 controlled substance prescriptions at pharmacies in Virginia from June 2009 through April 2010. Included in these were prescriptions for OxyContin 40 mg tablets and oxycodone 30 mg tablets. Evans utilized "Pharmacy I" in Lorton, Virginia to fill some of these prescriptions. Evans obtained some of these prescriptions from "Physician II" whose practice address is in Alexandria, Virginia and from associates of the physician with the first name Victor in Manassas, Virginia.

- Juanita Myers filled 33 controlled substance prescriptions at pharmacies in Virginia from May 2009 through May 2010. Included in these were prescriptions for OxyContin 40 mg tablets, oxycodone 30 mg tablets, and oxycodone 5 mg tablets (*i.e.* Percocet tablets). Myers utilized "Pharmacy I" in Lorton, Virginia to fill some of these prescriptions. Myers obtained some of these prescriptions from "Physician II" whose practice address is in Alexandria, Virginia.

- Louis Martelli filled 72 controlled substance prescriptions at pharmacies in Virginia from May 2009 through April 2010. Included in these were prescriptions for OxyContin 40 mg tablets, oxycodone 30 mg tablets, oxycodone 5 mg tablets (*i.e.* Percocet tablets), and Dilaudid tablets. Louis Martelli utilized "Pharmacy I" in Lorton, Virginia and the "Pharmacy II" in Woodbridge, Virginia to fill some of these prescriptions. Louis Martelli obtained some of these prescriptions from "Physician II" whose practice address is in Alexandria, Virginia and from a physician with the first name Victor, along with his associates, in Manassas, Virginia.

- James Martelli filled 23 controlled substance prescriptions at pharmacies in

Virginia from May 2009 through May 2010. Included in these were prescriptions for OxyContin 40 mg tablets, oxycodone 30 mg tablets, and oxycodone 10 mg tablets (*i.e.* Percocet tablets). James Martelli utilized "Pharmacy I" in Lorton, Virginia and the "Pharmacy II" in Woodbridge, Virginia to fill some of these prescriptions. James Martelli obtained some of these prescriptions from "Physician II" whose practice address is in Alexandria, Virginia and from a physician with the first name Victor in Manassas, Virginia.

30.     In summary, your affiant's review of the Virginia PMP data indicated that Calvin Dove and his co-conspirators had access to, between May 2009 and May 2010, prescription narcotics consistent with those sold by Calvin Dove and his wife, Linda Dove, during the seven, controlled purchases documented earlier in this affidavit (*i.e.* OxyContin 40 mg, oxycodone 30 mg and Dilaudid). According to the PMP data, during this one year period, the named defendants filled more than 250 prescriptions for controlled substances at pharmacies located in Virginia. Additionally, the PMP data revealed, consistent with the statements of CI-1, that at least a portion of these medications, for all named defendants except for Linda Dove, were obtained either from the practice of a physician with the first name Victor in Manassas, Virginia and/or from a separate physician, "Physician II," in Alexandria, Virginia. The PMP data also revealed, consistent with the statements of CI-1, that at least a portion of these prescriptions, for all named defendants except for Linda Dove, were filled at "Pharmacy I" in Lorton, Virginia, located near "the Residence," or "Pharmacy II" in Woodbridge, Virginia.

### Telephone Numbers Associated with Dove's "Patients"

31.     On May 26, 2010, your affiant contacted "Pharmacy II" and another pharmacy, "Pharmacy III," requesting telephone numbers associated with the pharmacy accounts of a number of Calvin Dove's "patients." The following telephone numbers, among others, were provided:

- "Pharmacy III" had a phone number of (xxx) xxx-1134 listed in their records for Louis Martelli, DOB: xx/xx/1970.

- "Pharmacy II" had a phone number of (xxx) xxx-1134 listed in their records for James Martelli, DOB: xx/xx/1955.

- "Pharmacy III" had a phone number of (xxx) xxx-8274 listed in their records for Valorie Evans, DOB: xx/xx/1957.

- "Pharmacy III" had a phone number of (xxx) xxx-5798 listed in their records for Brett Reel, DOB xx/xx/1974.

- "Pharmacy III" had a phone number of (xxx) xxx-6307 listed in their records for Juanita Myers, DOB: xx/xx/1964.

32.     On May 27, 2010, your affiant met with CI-1. On that date, CI-1 provided the following telephone numbers, among others, that CI-1 had stored in CI-1's cellular telephone for a number of Calvin Dove's "patients":

- CI-1 had a phone number of (xxx) xxx-1134 for Dove's "patient" Louis LNU.

- CI-1 had a phone number of (xxx) xxx-8274 for Dove's "patient" Val LNU.

- CI-1 had a phone number of (xxx) xxx-9042 for Dove's "patient" Juanita Myers.

- CI-1 had a phone number of (xxx) xxx-4029 for Dove's patient Kim LNU.

**Review and Analysis of Cellular Telephone Records**

33.     Another FBI agent assisting your affiant with this investigation reviewed cellular telephone call records related to phone number (xxx) xxx-1833, the number given by CI-1 as belonging to Calvin Dove and used to coordinate his drug trafficking activities. These records, received from Sprint/Nextel, indicated that this number was designated to an account assigned to Calvin Dove with a billing address of "the Residence." The records indicated that this account was opened in October 2009. The other FBI agent reviewed these cellular telephone call records

for instances of incoming calls from or outgoing calls to any of the Calvin Dove "patient"

telephone numbers listed above in the preceding paragraphs. This review yielded the following

information:

- (xxx) xxx-1833 (Dove) placed or received approximately 400 calls to/from (xxx) xxx-0814 (See paragraph 25 - Louis Martelli). Included in these are calls placed on the specific dates that PMP records reflect Louis Martelli's prescriptions, issued by the physican's office in Alexandria, Virginia, being filled.

- (xxx) xxx-1833 (Dove) placed or received approximately 300 calls to/from (xxx) xxx-1134 (See paragraphs 31 and 32 - Louis Martelli and James Martelli) during the eight-month period from October 2009 to May 2010. Included in these are calls placed on the specific dates that PMP records reflect Louis Martelli's prescriptions, issued both by the physician named Victor in Manassas, Virginia and by the physican's office in Alexandria, Virginia, being filled.

- (xxx) xxx-1833 (Dove) placed or received approximately 500 calls to/from (xxx) xxx-8274 (See paragraphs 31 and 32 - Valorie Evans) during the eight-month period from October 2009 to May 2010. Included in these were calls placed on the specific dates that PMP records reflect Valorie Evans' prescriptions, issued by the physician's office in Alexandria, Virginia, being filled.

- (xxx) xxx-1833 (Dove) placed or received approximately 15 calls to/from (xxx) xxx-5798 (See paragraph 31 - Brett Reel) during the six-month period from December 2009 to May 2010.

- (xxx) xxx-1833 (Dove) placed or received approximately 200 calls to/from (xxx) xxx-6307 (See paragraph 31 - Juanita Myers) during the six-month period from November 2009 to April 2010.

- (xxx) xxx-1833 (Dove) placed or received approximately 35 calls to/from (xxx) xxx-9042 (See paragraph 32 - Juanita Myers) during April and May of 2010. Included in these are calls placed on the specific dates that PMP records reflect Myer's prescriptions, issued by the physician's office in Alexandria, Virginia, being filled.

- (xxx) xxx-1833 (Dove) placed or received approximately 150 calls to/from (xxx) xxx-4029 (See paragraph 32 - Kimberly Johnson) during the four-month period from February 2010 to May 2010. Included in these are calls placed on the specific dates that PMP records reflect Kimberly Johnson's prescriptions, issued by a physician with the first name Victor in Manassas, Virginia, being filled.

## Vehicles Utilized in the Distribution Scheme

34.     As detailed above in paragraphs 13 and 16, the vehicle in which Calvin Dove conducted the second and fifth controlled purchases of pills was observed by law enforcement to be a blue Lincoln sedan bearing Virginia license plate xxx 7805.

35.     On several occasions during May 2010, your affiant has observed a blue Lincoln sedan parked in the driveway at "the Residence."

36.     As detailed in paragraph 15, the vehicle in which Calvin Dove conducted the fourth controlled purchase of pills was observed by law enforcement to be a gray Ford pickup truck bearing Virginia license plate xxx 1038.

37.     On May 21, 2010, your affiant observed a gray Ford pickup truck bearing Virginia license plate xxx 1038 pulling into the driveway of "the Residence."

38.     On May 27, 2010, your affiant observed a person matching the physical description of Calvin Dove driving on Gunston Road in Lorton, Virginia in the same gray Ford pickup truck as described in the preceding paragraph.

39.     During April and May 2010, your affiant reviewed Virginia Department of Motor Vehicles registration records related to Virginia license plates xxx 7805 and xxx 1038. The review revealed the following:

- xxx 7805 is assigned to a blue Lincoln registered to Calvin Edward Dove at "the Residence." This registration lists the vehicle with Vehicle Identification Number (VIN) xxxxxxxxxxxxxx7187.

- xxx 1038 is assigned to a gray Ford pickup registered to Valorie Lynne Evans. The registration lists the vehicle with Vehicle Identification Number (VIN) xxxxxxxxxxxxxx7513.

-20-

## Additional Address Details Related to
## "the Residence"

40.    On April 22, 2010, your affiant reviewed Virginia Department of Motor Vehicles

(DMV) Driver's License and Vehicles reports and DMV photograph associated with Calvin

Edward Dove, Jr.  The DMV reports indicated that Calvin Edward Dove Jr.'s current address of

record is "the Residence."

## Training and Experience of Your Affiant

41.    Through my training, experience and participation in investigations of drug

traffickers, I have acquired the knowledge to recognize the methods used by drug traffickers to

conceal their drugs, assets, income and activities from the government and other third parties.

Based on my training and experience, I know the following:

- That drug traffickers generate significant profits from their illegal trafficking of narcotics and as a result, often maintain quantities of currency and/or controlled substances, both illicit and prescription, readily accessible to them in order to maintain and/or finance their ongoing illegal activities. The currency and/or controlled substances are typically maintained within a residence, within a vehicle, in a safe or lock box within a residence, within a vehicle, in a safe deposit box at a financial institution, or on the individual themselves;

- That drug traffickers maintain books, records, receipts, bank statements and records, money drafts, letters of credit, money orders, cashiers checks, documents relating to safety deposit boxes, and other documents evidencing the acquisition, secreting, transfer, and concealment of assets and currency.  These records are typically maintained at a place such as a residence, within a vehicle, in a safe or lock box within a residence, in a safety deposit box at a financial institution, or on the individual, where the individual has ready access to these documents and they are concealed from law enforcement authorities;

- That drug traffickers commonly "front" (provide illegal controlled substances on consignment) to their clients.  That books, records, receipts, handwritten notes, ledgers, audio tape recordings, and computer records are maintained for the

purpose of documenting fronted controlled substances to these individuals. These records are typically maintained at a residence, within a vehicle, in a safe or lock box within a residence, in a safety deposit box, or on the individual, where the individual has ready access to these documents and they are concealed from law enforcement authorities;

- That drug traffickers commonly maintain addresses or telephone numbers and books or papers which reflect names, addresses, and/or telephone numbers of their associates and clients in their drug trafficking activities and they typically maintain these records in a residence, within a vehicle, in a safe or lock box within a residence, in a safety deposit box, or on the individual, where they are concealed from law enforcement authorities;

- That drug traffickers maintain safety deposit boxes as a place to store large amounts of currency generated through the sale of illegal drugs. Safety deposit boxes are used because they provide the individual with secure, but ready access to the contents of these boxes and the contents are concealed from law enforcement authorities, including the Internal Revenue Service (IRS);

- That drug traffickers purchase and maintain caches of precious metals, jewelry, and other items of value like power tools, electronics or other merchandise relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in drug trafficking activities. These items are often maintained at a residence, within a vehicle, in an outbuilding on the premises, in a safe or lock box within a residence, in a safety deposit box, or on the individual;

- That drug traffickers frequently take or cause to be taken, photographs, videotapes, and audio tapes of themselves, their associates, their properties, and their contraband, and that these traffickers usually maintain these photographs, videotapes, or audio tapes at a residence, within a vehicle, in a safe or lock box within a residence, in a safety deposit box, or on the individual;

- That prescription drug traffickers typically maintain drug supply records such as records related to physicians or pharmacies, written prescriptions, blank prescriptions, pharmacy receipts and reports, health insurance records, prescription bottles both empty and filled, and other prescription related documents in a residence, within a vehicle, in a safe or lock box within a residence, in a safe deposit box, or on the individual;

- That prescription drug traffickers often maintain different forms, types and dosage strengths of controlled substance prescription drugs, as well as supplies of illicit drugs, to meet the varied preferences of their customers;

- That drug traffickers typically utilize land-line or cellular telephones to arrange and conduct their illegal drug trafficking activities and that telephones are utilized by drug traffickers to contact both drug suppliers and drug customers;

- That drug traffickers often maintain records of their drug activities in electronic form on digital mediums such as home desktop computers, laptop computers, thumb drives, floppy discs, compact discs and other means of digital storage;

- That drug traffickers maintain firearms which are readily accessible for use as protection of the trafficker, his/her cash or other valuables, and drugs, and for use during and in relation to drug trafficking, and that federal courts have consistently recognized firearms as "tools of the trade" of drug trafficking.

### Conclusion

42.     In summary, your affiant's review of the Virginia PMP data indicated that Calvin Dove and his co-conspirators had access, between May 2009 and May 2010, to prescription narcotics consistent with those sold by Calvin Dove and his wife, Linda Dove, during the seven, controlled purchases documented earlier in this affidavit (*i.e.* OxyContin 40 mg, oxycodone 30 mg and Dilaudid). According to the PMP data, during this one year period, the named defendants filled more than 250 prescriptions for controlled substances at pharmacies located in Virginia. Additionally, the PMP data revealed, consistent with the statements of CI-1, that at least a portion of these medications, for all named defendants except for Linda Dove, were obtained either from the practice of "Dr. Victor" in Manassas, Virginia and/or from a separate physician, "Physician III," in Alexandria, Virginia. The PMP data also revealed, consistent with the statements of CI-1, that at least a portion of these prescriptions, for all named defendants except for Linda Dove, were filled at "Pharmacy I" in Lorton, Virginia located near "the Residence," or "Pharmacy II" in Woodbridge, Virginia.

43.     Based upon the foregoing, there is probable cause to believe that from in or about

2009 through the present within the Eastern District of Virginia, Calvin E. Dove, Jr., Linda A.

Dove, Valorie L. Evans, Kimberly L. Johnson, Louis J. Martelli, James L. Martelli, Juanita K.

Myers, and Brett P. Reel, knowingly and intentionally conspired to distribute, dispense, or

possess with intent to distribute or dispense (1) oxycodone, commonly known by the brand

names OxyContin, Roxicodone and Percocet and (2) hydromorphone, commonly known by the

brand name Dilaudid, both Schedule II controlled substances, in violation of Title 21, United

States Code, Sections 841(a)(1) and 846.

Aaron K. Weeter
Special Agent, FBI

Sworn and subscribed to before me          /s/
this 2nd day of June, 2010
             Theresa Carroll Buchanan
                United States Magistrate Judge

Hon. Theresa Buchanan
United States Magistrate Judge